[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 15696
On October 30, 1998, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Gladys D., mother, and Jose R., father, to their son, Juan R-L. On November 18, 1999, trial concerning the petition occurred in this court. For the reasons stated below, the court grants the termination petition.
FACTS
The court finds the following facts and credits the following evidence, except as noted.
A. Background of the Case
Juan R.-L. was born on December 17, 1994 and tested positive for heroin and marijuana. DCF was notified; his mother was referred to Ciudade Mujer Center in Hartford for substance abuse treatment. On March 25, 1995, DCF filed a petition in the Superior Court for Juvenile Matters in Hartford, alleging that Juan was neglected and uncared for. DCF alleged that Gladys D. had refused to accept substance abuse treatment, that she did not have sufficient infant supplies to care for Juan, and that he was in danger. On the same day, the court granted an order of temporary custody (OTC), after finding that Juan was in immediate physical danger from his surroundings and that removal was necessary to insure his safety. On the next day, Juan was placed with a foster family, with Miriam M., in whose care he has remained through trial.
Subsequently, on May 17, 1995, the court adjudicated Juan as neglected and committed his custody to the Commissioner of DCF, for a period not to exceed 18 months. On that date, the court entered Expectations (Pet. Exh. 4) which had been executed by both parents and their attorney. Among these expectations were: (1) keep parent's whereabouts known to DCF; (2) visit the child as often as DCF permits; (3) participate in counseling, including individual, family and drug/alcohol assessment ("counseling to address issues of domestic violence, anger management, prior history"); and (4) follow recommendations of drug evaluation.
On November 17, 1996, November 17, 1997, November 17, 1998 and September 28, 1999, Juan's commitment to DCF was extended. On CT Page 15697 December 16, 1997, the court found that family reunification efforts were no longer appropriate since Juan's parents had relocated to North Carolina.
B. The Mother
Gladys D. was born in 1974 in Puerto Rico and gave birth to her first child, Jasmine, in 1989, when Gladys D. was fourteen. At the age of sixteen, her second child, Jessica, was born in 1991. Subsequently, Gladys D. began using drugs, including crack cocaine, and engaged in prostitution to pay for drugs. Her third child, Luis, was born in 1992. In 1993, she met Jose R., with whom she had her fourth child, Herminia, in 1993. Herminia was abandoned and has been raised by a great aunt. In February, 1994, Gladys D. and Jose R. moved to Hartford, Connecticut, where Juan was born in December 1994, when Gladys D. was nineteen years old.
Although DCF referred Gladys D. for substance abuse treatment promptly after Juan was born, Gladys D. did not follow up on recommendations prior to the issuance of the OTC in March, 1995. At the time of Juan's removal, she still appeared to be under the influence of drugs. In addition, DCF referred her for services to the Hispanic Health Council. Service referrals included a parent aide, parenting classes, substance abuse counseling, furniture assistance, and the Visiting Nurse Association's (VNA) weekly checks on the baby's health.
Between March and July, 1995, subsequent to the OTC, DCF set up weekly visit appointments for the parents with Juan. Gladys D. and Jose R.'s record of visiting their child was sporadic. It was still apparent that Gladys D. was not attending treatment. DCF recommended that she go in-patient to attempt to deal with the substance abuse issues; she did not do so at that time. As the result of an August, 1995 arrest and subsequent convictions for prostitution and failure to appear she was placed on probation. Pet. Exh. 3. She then went to an in-patient program, Mother's Retreat, pursuant to court order. While there, she gave birth to her sixth child, Monica, in March, 1996.
At Mother's Retreat, she received individual counseling and attended various group sessions involving addiction education, life skills training, G.E.D. tutoring, parenting education, and classes in English as a Second Language. Pet. Exh. 7. at 1. After a few weeks, Gladys D. "balked" at various elements of the Mother's Retreat program. Id. Although she acknowledged a history CT Page 15698 of domestic violence in her relationship "with her significant other," she was unwilling to end it. Id.
She seemed dedicated to taking care of Monica but had trouble budgeting monies to buy food for her. Id. at 2. She enthusiastically participated in G.E.D. classes. Id.
In June, 1996, Gladys D. was unsuccessfully discharged, for non-compliance, from Mother's Retreat, after repeatedly returning late to the program from scheduled appointments. Id. at 3. However, she initiated contact with Crossroads Substance Abuse Treatment Center, another program, which required six months in-patient residency. She successfully completed this program and was discharged on December 19, 1996, when she moved to New London to live with Jose R. They were joined by her mother and the older children. While at Mother's Retreat and at Crossroads, DCF brought Juan to visit Gladys D. Juan was uncomfortable at these visits since he did not know his mother. Towards the end of this period, Juan's foster mother was present at visits. At the beginning of 1997, DCF's plan for Juan was reunification with his family.
C. The Father
Jose R. was born in 1961 in Puerto Rico. Through a prior marriage, he has two children, whose custody was placed with their grandmother. Besides the two children of that marriage and the two (Juan and Monica) he has with Gladys D., he has fathered four other children, none of whom are in his care.
Jose R. has had several in-patient stays as well as out-patient stays, for drug treatment and mental illness. Exh. E. He completed the Blue Hills Hospital drug treatment program in April, 1996. He completed in-patient treatment at Lebanon Pines with mixed success. He failed to follow through with the twelve-step recovery and out-patient counseling which were recommended.
In the summer of 1995, he acknowledged current drug use to a DCF social worker: Subsequently, he was discharged from the Care Plus Partial Hospitalization Program for noncompliance in February, 1997. In September, 1997, Care Plus determined that Jose R. did not need to attend that program; he was referred to the Care Clinic. He began there in September, 1997, but he was discharged a month later after missing appointments. He was CT Page 15699 employed on and off after the case was opened.
D. Juan and His Progress in Foster Care
As noted above, Juan has remained in the care of his foster mother, Miriam M., since the OTC, now a period of over four years and eight months. After testing in 1996, he was found to be doing well developmentally in all areas except language. Speech therapy was provided from July, 1996 to December, 1997, at which point his use of language had caught up to the norm for his age. Previously, he attended a Headstart program.
In Miriam M.'s home, he lives with other children, including adopted and birth children. According to Miriam M., who testified at trial, Juan, who is now attending kindergarten, does well in school and is an intelligent, well-behaved child. He calls Miriam M. "Mommy" and he calls her husband "Poppy." He sees Miriam M. and her family as his family.
Miriam M. is not certain that Juan remembers his parents, since he has not seen them since October, 1997, a period of over two years in the life of a child who will not turn five until mid-December, 1999. Juan does not ask about his parents.
During the period of time when Gladys D. and Jose R. lived in New London in 1997, DCF took Juan to visit there on a weekly basis. Miriam M. found him to be unhappy and "unrestful" when her returned from these visits. He did not want to go on the visits.
Miriam M. described her affection for Juan. Mr. and Mrs. M. have expressed interest in adopting Juan if he were legally available to adopt.
E. Efforts Toward Reunification
In spring, 1997, DCF pursued the goal of reunification by having Juan visit overnight on a regular basis with his parents and the other children in New London. However, the planned reunification was disrupted by domestic violence.
On one occasion, Enid Morales, a DCF worker, saw Gladys D. hit one of the other children very hard in the head during a home visit. It appeared that this child was even scared to cry as a result. During Juan's visits, it was observed that Gladys D. began to show no emotion towards him; there was no bonding CT Page 15700 between them. In contrast, it appeared that Jose R. had a bond with Juan since he did interact with him during visits.
However, other incidents of domestic violence occurred. In May, 1997, Juan's half-sister Jessica reported that Jose R. had struck her with a stick on her buttocks. Marks from this incident were seen by Ms. Morales. Also, it was reported that Jose R. had tripped the youngest child, Monica, causing her to have a cut lip. Also, Jose R. admitted hitting one child with a belt.
DCF ended overnight visits and went back to bringing Juan to visit once a week in July 1997. Interaction between Juan and his parents declined. At least one visit was terminated due to the parents' lack of involvement with Juan.
During this period, the parents were both referred to individual and family counseling through Family Services in New London in order to address their own histories of childhood abuse, domestic violence in their own family, and anger management related to inappropriate corporal punishment of the children. Jose R. was discharged from services for non-attendance on September 30, 1997; Gladys D. was discharged for the same reason on October 21, 1997. They were also referred to the Reunification Program of El Centro. While Gladys D. completed this program on July 31, 1997, Jose R. participated in only one session. This program recommended that Gladys D. enroll in parenting classes and a referral was made to the Parent Aide Program, but the parents would not accept its services since they planned to leave the area. Exh. 9.
Over time, Juan appeared more distant from his parents. He did not play with them or seek comfort or affection from them. He stated that he did not wish to see them.
F. The Parents' Departure And Its Aftermath
In October, 1997, Claudia Mitchell, the then-DCF worker assigned to the case, went to the parents' New London home and reminded Jose R. of a court date on the next day for Juan's case. The parents failed to appear, then called Ms. Mitchell to tell her that they were moving to North Carolina and that Juan should remain in his foster home. On October 25, 1997, the last visit occurred. On October 29, 1997, the parents were advised of a November 4, 1997 hearing; Jose R. said they would appear. A visit with Juan was scheduled for October 31, 1997; Jose R. asked that CT Page 15701 it be cancelled.
On November 4, 1997, Ms. Mitchell went to pick up the parents to bring them to court. She found that the apartment had been vacated; the parents had moved to North Carolina. They left no forwarding address with DCF or with the foster mother, although they knew how to contact her. They made no arrangements to prepare Juan for their departure or to maintain contact with him afterwards.
They maintained no communication with him, sending no cards, letters or gifts. Juan has not seen his parents since October, 1997.
Ms. Mitchell finally received a phone call from Jose R. in February, 1998, but had no further contact with the parents until she heard from North Carolina's equivalent department to DCF that the family was moving to New York in May, 1998. Again, DCF was not provided with an address for the parents in New York City. During this period, the parents made no effort to contact DCF even to inquire as to Juan's well-being.
In late August, 1998, DCF became aware of the parent's New York phone number. They were staying at a shelter and declined to provide their address. Eventually, DCF located their address and sent them papers concerning an extension of Juan's commitment to DCF. DCF did not hear from the parents again until October, 1998. They did attend an administrative case review in January, 1999 and sought visitation through an administrative hearing, but ultimately did not attend after it was scheduled. Between January, 1999 and the eve of trial, the DCF-assigned worker did not hear from the parents.
In July, 1999, DCF communicated with New York authorities, who had removed the four other children (Jasmine, Jessica, Luis, and Monica) from the care of the mother and placed them in foster care. According to Exh. 2, a report from the New York Administration for Children's Services, dated July 16, 1999, Gladys D. had resumed using drugs and, at a home visit, the children were found to be dirty and unkempt and had head lice.
ADJUDICATION
A. Reunification
CT Page 15702
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112 (c)(1). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. The statute does not define the term "reasonable." Our Supreme Court has found that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim,185 Conn. 118, 122 (1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that reasonable efforts means doing everything reasonable, not everything possible." In re Savanna M., 55 Conn. App. 807,812-813 (1999) (citations omitted); In re Jessica B.,50 Conn. App. 554, 566 (1998).
On December 16, 1997, the court made the requisite finding that further efforts to reunify the parents with Juan were no longer appropriate. This court also finds, based on the evidence presented at trial, by clear and convincing evidence, that such efforts are not appropriate. In addition, the court finds, by clear and convincing evidence, that DCF made reasonable efforts to reunify the family.
After the OTC, DCF provided visitation, casework, and service referrals for the family. Referrals were made, among others, for individual and family counseling, substance abuse treatment, parenting classes, parent aide, and a reunification program. While initially the parents made efforts and progress, the plan for reunification was disrupted in 1997 by incidents of domestic violence involving the parents' other children. Subsequently, the quality of visits and interaction between Juan and his parents declined. They failed to continue with necessary counseling. Finally, in the fall of 1997, the situation suffered a precipitous decline: the parents abandoned Juan by leaving the state.
Without question, DCF made reasonable efforts to reunify the family. The parents' conduct showed that they were unable to benefit from these efforts. Such efforts became inappropriate. CT Page 15703
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998), cert. denied,247 Conn. 919 (1998). Conn. Gen. Stat. § 17a-112 (c)(3).
DCF has alleged the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship as to both parents. The court finds that DCF has proven each ground by clear and convincing evidence.
1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of "interest, concern or responsibility' for the welfare of a child." In reMindalia M., 6 Conn. App. 194, 208-209, cert. denied,199 Conn. 809 (1986) (citation omitted). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "maintain" implies a "continuing, reason able degree of concern." Id. at 210.
Here, beginning in October, 1997, the parents abandoned Juan when they stopped seeing him and left the state without advising the foster family or DCF where they could be reached. Juan did not see them between October, 1997 and the filing of the petition one year later at the end of October, 1998. In the interim, they maintained no communication with him, although they knew where he was. In addition, until DCF located the parents in New York in the summer of 1998, the parents made no effort to contact DCF even to inquire as to their child's well-being. By clear and convincing evidence, they abandoned Juan to be cared for by his foster family and DCF.
2. Failure to Rehabilitate
CT Page 15704
This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The court previously has found the child to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child. Conn. Gen. Stat. § 17a-112 (c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In reLuis C., 210 Conn. 157, 167 (1989); In Hector L.,53 Conn. App. 359, 366-67 (1999). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is appropriate for the court to consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it. Here, over one year elapsed between the filing of the termination petition in October, 1998 and the trial in November, 1999, which is a reasonable time, especially given the age of the child.
As the Appellate court recently noted In re Danuael D.,51 Conn. App. 829, 839 (1999), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." At this adjudicatory phase, the question is whether either Gladys D. or Jose R. was better able to be a parent to Juan when the petition was filed than at the time of his commitment. See In re Michael M., 29 Conn. App. 112,126 (1992). As noted, the petition was filed in October, 1998, over three years and five months after the neglect adjudication in May, 1995. The evidence is clear and convincing that neither Gladys D. nor Jose R. is able to be a parent to Juan and that neither could become able to do so within a reasonable time.
In accordance with the court-ordered Expectations, Exh. 4, DCF made appropriate referrals for the parents to receive CT Page 15705 individual and family counseling, including for the purposes of addressing domestic violence, anger management, and their prior history. They also were ordered to cooperate with all service providers. Id. Subsequent to the neglect commitment, serious allegations of physical child abuse were substantiated. The parents then failed to follow up with counseling to address those issues. They were discharged from such counseling for non-compliance. They then rejected the services of the parent aide program to which they were referred. Then, they compounded this evidence of their failures to be rehabilitated by leaving Juan behind and not contacting him after they left the state. Their effort to seek visitation, made in January, 1999, after Juan had been with his foster family since March, 1995, was more than a little late.
During all the time which has elapsed since Gladys D. and Jose R. left for North Carolina in the fall of 1997, Juan has continued to be cared for by his foster family, with whom he is securely bonded. Most recently, in the summer of 1999, New York authorities found Gladys D.'s other children to be in deplorable condition. They, too, were removed from her care.
As noted above, the key is the ability to be a parent to this child, Juan. The law sees the child as an individual, whose age and needs are to be uniquely considered. Gladys D. and Jose R. squandered their opportunity to be parents to Juan. The bond between them and Juan was noticeably deteriorating in the summer of 1997. In the fall of 1997, they left Juan in the care of his foster family and turned their backs on him. Fortunately, he is a member of Miriam M.'s family and is bonded to them. Even in 1997, he became reluctant to visit his biological parents. Now, he has no relationship with them except one of a biological nature.
Despite their initial efforts at addressing some of the issues which led to Juan's removal, the parents have demonstrated that they have not been rehabilitated. They cannot assume a responsible position in Juan's life now. They have had a more than reasonable opportunity to establish and maintain a relationship with Juan. There is no reason to believe that they would be able to assume a responsible position in his life in the future.
3. No On-Going Relationship
DCF also alleges that there is no ongoing parent-child CT Page 15706 relationship between Juan and his parents. To prove this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(D); In re Savanna M., 55 Conn. App. 807, 815
(1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re JuvenileAppeal (Anonymous). 181 Conn. 638, 645 (1980) (internal citation omitted). The decisive question is "whether the child has no present memories or feelings for the natural parent." Id. At 646. As the Appellate Court recently noted, "the feelings of the child are of paramount importance." In re Tabitha T.,51 Conn. App. 595, 602 (1999). "Feelings for the natural parent connotes feelings of a positive nature only." Id.
Here, based on the foregoing findings and discussion, there is no doubt that the required relationship between Juan and his parents is absent. Prior to their departure from Connecticut in the fall of 1997, when Juan was not yet three years old, he was reluctant to visit his parents. He had become distant from them. Between then and the date of the petition, October 30, 1998, the parents did not have any contact with him. He has not asked about them. Clearly and convincingly, there is no ongoing relationship between them. Juan has been with Miriam M. and her family since March, 1995, almost all of his life, a period of over four years and eight months. That family, as opposed to his biological parents, has met his parental needs for all of that time. He is securely bonded to them.
In deciding whether it would be in Juan's best interest to permit further time for a relationship with Gladys D. and Jose R. to develop, the court may consider several factors. In re SavannaM., 55 Conn. App. At 816. In view of the extensive stay Juan has had with his foster family, his bonded relationships with them, the total dearth of contact he has had with his biological parents, and the lack of any relationship between him and them, it is clearly not in Juan's best interest to permit additional time to pass in foster care in order to allow his parents to attempt to establish a relationship with him. CT Page 15707
DISPOSITION OF THE TERMINATION PETITION
In the disposition phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The Appellate Court has "consistently held that to allow a child to languish in foster care is not in the child's best interest." In re Drew R., 47 Conn. App. 124, 131 (1997). Four years and eight months in foster care is more than enough for Juan. Based on the foregoing findings and discussion, the court finds, by clear and convincing evidence, that termination of Gladys D.'s and Jose R.'s parental rights is in Juan's best interest. He needs and is entitled to permanency and stability in order to continue to properly develop. If Gladys D.'s and Jose R.'s parental rights were allowed to continue and if Juan's familial attachment to his foster family was disrupted, it could cause significant emotional damage to him. To permit this would be ignoring him as a person, as well as the relationships established with those who have cared for him almost all of his life. Added to these factors is the evidence that, even as late as this past summer, the other children were removed from his mother's care in New York due to the fact that the children were in poor condition. Fortunately for Juan, he is in a caring home with capable parents. The evidence is clear and convincing that Gladys D.'s and Jose R.'s parental rights must come to an end.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112 (d). See In re Tabitha P.,39 Conn. App. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for Juan and timely offered the parents services and visitation. These services were relevant to the needs of the parents. CT Page 15708
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF provided visitation and made reasonable efforts to reunite the family, but that there was no reasonable possibility of reunification as a result of the parents' failure to utilize services and subsequent abandonment of their child.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On May 17, 1995, at the time of the neglect adjudication, the parents signed and the court entered Expectations. Exh. 4. These included: (1) Keep all appointments set by or with DCF and keep whereabouts known to DCF and your attorney; (2) visit the child as often as DCF permits; (3) participate in counseling (to address issues of domestic violence, anger management, prior history, including counselor or clinic, individual, family and drug/alcohol assessment; (4) follow recommendations of drug evaluation; (5) cooperate with all service providers; (6) sign releases as requested; (7) secure/maintain adequate housing and income; (8) no substance abuse; (9) no involvement with the criminal justice system; and (10) cooperate with random urine screens.
The court finds the following as to compliance with the terms of the Expectations. Although, initially, the parents made efforts to keep appointments and keep their whereabouts known, they stopped doing so in the fall of 1997. At that point, they also failed to visit Juan and did not even seek to do so for more than one year. Although they did participate in some counseling, after the domestic violence incidents of 1997 they failed to comply and were discharged from counseling for lack of attendance. Their follow-up on recommendations of drug evaluations varied. However, there is no evidence that Jose R. resumed drug use of gravest concern is the recent report that Gladys D. has begun using drugs again, with evident effect on her ability to care for her children.
By failing to engage in counseling, the parents did not cooperate with service providers. They did sign releases as CT Page 15709 requested. While in New London, Connecticut in 1997, their housing appeared to be adequate. Their fall, 1997 departure precluded a meaningful evaluation of their housing and income on subsequent dates. Apparently, except for Gladys D.'s convictions in 1995, neither Parent has had subsequent involvement with the criminal justice system. The parents did cooperate with random urine screens.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Even before his parents left him in Connecticut, Juan's relationship with his parents had deteriorated. By this point, he has no emotional ties to them. He is securely attached and bonded to his foster family.
5) The age of the child.
Juan will be five years old on December 17, 1999.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitation, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that Gladys D. and Jose R. have not made reasonable efforts to adjust their circumstances or conditions to make it in Juan's best interest to return to them in the foreseeable future. In October, 1997, Juan was abandoned by his parents. They did not make efforts to maintain contact with him, except for the belated attempt in the administrative process to seek visitation. The opportunity to develop a significant relationship with him was lost.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the CT Page 15710 unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
The parents did not face unreasonable interference from each other, from any third persons; or from economic circumstances. Their predicament is a consequence of their own actions and their failures to act.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Juan for a termination of parental rights to enter with respect to the mother, Gladys D., and the father, Jose R. Accordingly, the court hereby grants the petition to terminate the parental rights of Gladys D. and Jose R.
The court further orders that the Commissioner of DCF is appointed statutory parent for Juan for the purpose of securing an adoptive family. If the foster mother is willing to adopt, it is the court's direction that she receive first consideration. The Commissioner shall file with this court no later than sixty days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT
[1] Thus entitled in accordance with Connecticut Statutes § § 46b-124, 45a-715 (b) and Connecticut Practice Book §35-5. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and only upon order of the Superior Court.